## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| OCTAVIO CALVILLO, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. 07-S-776-NE** |
| | ) | |
| TYSON FOODS, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This is an employment discrimination case. Plaintiff, Octavio Calvillo, is a

Mexican immigrant who worked for Tyson Foods, Inc., from March 21, 2003 until

August 1, 2006.[1] Calvillo alleges discrimination on the basis of his national origin

in wages, job assignments, the creation of a hostile work environment and, ultimately,

termination of his employment. He bases these claims on Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C.

§ 1981.[2] Tyson has moved for summary judgment on all of plaintiff's claims.[3] In

response, Calvillo concedes that his wage discrimination claim is due to be

---

[1] *See* doc. no. 1, ¶ 3.

[2] *Id.*, ¶¶ 5-23. This court previously dismissed Count V of plaintiff's complaint, which alleged that Hispanic employees of Tyson were, as a class, subject to myriad types of workplace discrimination because plaintiff never filed a motion for class certification regarding this claims and openly conceded that the class allegations were due to be dismissed in his response to Tyson's motion for summary judgment. *See* doc. no. 26 (Order dismissing class claims).

[3] Doc. no. 17 (Tyson's motion for summary judgment).

dismissed,[4] and judgment will be entered in favor of Tyson on that aspect of plaintiff's case without further discussion. As discussed below, however, the court concludes that the remainder of Tyson's motion for summary judgment should be granted in part and denied in part.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[5] "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing

---

[4] *See* doc. no. 21, at 2 ("Plaintiff concedes that summary judgment should be granted regarding Plaintiff's class action and wage claims.").

[5] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted) (bracketed text suppled).

## II. SUMMARY OF FACTS

Calvillo began his employment with Tyson on March 21, 2003, as a "harvester operator."[6] In that position, Calvillo worked as part of a crew that captured chickens slated for slaughter with the aid of a so-called "chicken-catching machine," and then transported the birds to Tyson poultry processing facilities.[7] The crew usually consisted of five or six harvester operators, one "loader operator," and one supervisor.[8] Calvillo's supervisor from February 2005 until his termination on August 1, 2006, Wayne Waldrep, described the operation of the "chicken-catching machine" as follows:

One end of the chicken catching machine works like a vacuum to pull

---

[6] *See* doc. no. 19, Statement of Undisputed Facts, ¶ 6.

[7] *See* doc. no. 19, Exhibit 4 (Declaration of Wayne Waldrep), ¶ 4.

[8] *Id.*, ¶ 3.

the chickens onto a conveyor belt.  A rising platform is located at the end of the conveyor belt.  Behind the rising platform, five cages are stacked vertically on top of one another with two stacks of five aligned side by side on a rotating and tilting platform.[9]

The crew used the machine to capture chickens in one to three chicken houses each day at various poultry farms in Alabama.[10]

When the crew arrived at a farm, Waldrep would instruct three harvester operators to "set-up" the first chicken house, while the remaining harvester operators were directed to inspect and prepare the chicken-catching machine for operation.[11] The duties of those harvester operators who were directed to "set-up" the chicken house included removing dead birds and hanging plastic sheets ("curtains") on posts throughout the house to prevent the chickens from backing into each other and smothering.[12]  The remaining harvester operators checked the fuel level, fluid levels, and mechanical parts of the chicken-catching machine, to ensure that it was in working order.[13]

After the chicken house and machine were prepared, Waldrep assigned each

---

[9] *Id.*, ¶ 8.

[10] *See* doc. no. 19, Exhibit 1 (Deposition of Calvillo), at 131.

[11] *See* doc. no. 19, Exhibit 4 (Declaration of Wayne Waldrep), ¶ 4.

[12] *Id.*, ¶ 5.

[13] *Id.*, ¶ 6.

harvester operator individual tasks.[14]   Those assignments typically included: operating the machine's controls; loading the cages; stacking the cages; and walking beside the machine to herd the chickens in the direction of its suction device.[15] Waldrep states that each day he "would rotate who performed the various jobs on the machine from house to house based on each individual[']s familiarity with and ability to perform the jobs."[16]   Waldrep primarily assigned Calvillo to hang curtains, walk beside the machine, and operate the machine's controls.[17]

On July 31, 2006, the crew to which Calvillo was assigned was directed to catch chickens in three poultry houses on the Sand Mountain farm of Larry Don Dalton.[18]   The crew supervised by Waldrep consisted of Calvillo, George Tovar, Vincente Zavala, Marcos Parra, Anthony Lemaster, and Tim Coffey.[19]   Zavala and Parra are, like Calvillo, natives of Mexico, Tovar is from Latin American, and Lemaster and Coffey are Caucasian American citizens.[20]   Calvillo hung the curtains in the first chicken house; Marcos Parra hung the curtains in the second chicken

---

[14] *Id.*, ¶ 7.

[15] *Id.*

[16] *Id.*, ¶ 10.

[17] *See* doc. no. 19, Exhibit 4 (Declaration of Wayne Waldrep), ¶ 10.

[18] *See* doc. no. 21, Exhibit 1 (Deposition of Calvillo), at 183.  *See also* doc. no. 19 Exhibit 4 (Declaration of Wayne Waldrep), Exhibit B.

[19] *See* doc. no. 19, Statement of Undisputed Facts, ¶ 22.

[20] *Id.*, ¶¶ 23-25.

house; and, according to Calvillo, Anthony Lemaster was directed by Waldrep to hang curtains in the third chicken house.[21]   Lemaster said "No" to Waldrep's directive, however, and refused to hang curtains;[22] whereupon, Waldrep turned to Calvillo and said:   "Hey, fucking wetback, come here you."[23]   Waldrep then instructed Calvillo to "hang the curtains."[24]  Calvillo refused, saying: "If Anthony's not going to do it, I'm not going to do it either."[25]  Calvillo also stated: "It's not my fucking job."[26]

Waldrep then said to Calvillo:  "If you don't put the curtains up, then you're not coming back."[27]   Calvillo still refused to do so, and walked out of the chicken house.[28]   The record is unclear as to whether Calvillo "flipped Waldrep the bird" when he refused to hang the curtains, or made that gesture to Waldrep the following day, August 1, 2006.[29]  Calvillo later attempted to reenter the chicken house, but was

---

[21] *See* doc. no. 21, Exhibit 1 (Deposition of Calvillo), at 184.

[22] *Id*.

[23] Doc. no. 21, Exhibit 3 (Video clip of deposition of Calvillo).

[24] *See* doc. no. 21, Exhibit 1 (Deposition of Calvillo), at 184.

[25] *Id*.

[26] *Id*. at 184-85.

[27] *Id*. at 185.

[28] *Id*.

[29] *Id*. at 186.  (In a deposition Calvillo was asked:  "Did you flip the bird to Wayne?" Calvillo responded:  "No, not that day.  Outside, I did, when he told me I couldn't come back in again.")

told by Waldrep that he "couldn't come back in again."[30]  Calvillo testified that he understood that he would be fired if he did not hang the curtains.[31]

Later that day, Waldrep reported the incident to Allan Trotter — identified in this record as being the "Human Resources Manager for the Alabama Live Haul Production Complex" — and recommended that Calvillo be fired for insubordination.[32]  "Tyson's Rules of Conduct" provided that "a person can be discharged for insubordination or refusal to perform a work assignment."[33]  Trotter agreed with Waldrep's recommendation.[34]

On August 1, 2006, the day after the incident described above, Calvillo attempted to rejoin his crew at the poultry farm owned by Karen Lee Boyd.[35]  When Waldrep saw Calvillo walking up, however, he said "get that fucking spick off my farm . . . he doesn't work for Tyson anymore."[36]  Waldrep instructed Calvillo to speak with John Davis (Waldrep's supervisor), who informed Calvillo that his employment

---

[30] Doc. no. 21, Exhibit 1 (Deposition of Calvillo), at 186.

[31] *See* doc. no. 21, Exhibit 1 (Deposition of Calvillo), at 183.

[32] *See* doc. no. 19, Exhibit 3 (Declaration of Allan Trotter), ¶¶ 2, 3.

[33] *See* doc. no. 19, Exhibit 2 (Declaration of Angela Cole), ¶ 13 and Exhibit 3 (Declaration of Allan Trotter), ¶ 3.

[34] *See* doc. no. 19, Exhibit 2 (Declaration of Angela Cole), ¶ 13 and Exhibit 3 (Declaration of Allan Trotter), ¶ 3.

[35] Doc. no. 21, Exhibit 2 (Affidavit of Karen Lee Boyd).

[36] *Id*.

had been terminated.[37]   The following day, August 2, 2006, Calvillo went to the personnel office of the Tyson poultry processing facility in Albertville, Alabama, to file a complaint about harassment by Waldrep and the events that led to his termination.[38]   Trotter investigated Calvillo's claims by interviewing five members of Calvillo's crew and found no evidence corroborating his allegations.[39]

Tyson has written policies prohibiting discrimination, retaliation, or harassment on the basis of national origin, and its employees are trained annually on the content and requirements of those policies.[40]   Calvillo received a Spanish-language version of the policy as part of his orientation training when he was hired in March of 2003.[41] The policy provides the names of, and contact information for, various individuals to whom harassment and discriminatory conduct should be reported.[42]

Calvillo contends that, in compliance with those policies, he had reported harassment to Tyson officials at least twice prior to the date on which he was fired.[43] Calvillo testified that, approximately six or seven months before his termination, he

---

[37] *See* doc. no. 21, Exhibit 1 (Deposition of Calvillo), at 188.

[38] *See* doc. no. 19, Exhibit 3 (Declaration of Allan Trotter), ¶ 4 and Exhibit B (Investigation file).

[39] *See* doc. no. 19, Exhibit 3 (Declaration of Allan Trotter), ¶ 4.

[40] *See* doc. no. 19, Statement of Undisputed Facts, ¶ 52.

[41] *Id.*, ¶ 52.

[42] *See* doc. no. 19, Statement of Undisputed Facts, ¶ 54.

[43] *See* doc. no. 21, Response to Tyson's Statement of Undisputed Facts, ¶ 10.

filed a written complaint with the personnel office at the Albertville poultry processing facility.[44]  Calvillo says that he reported Waldrep was mistreating him, and that Waldrep had threatened him when stating that his (Waldrep's) brother was a member of the K.K.K. and would burn Calvillo's home.[45]  Calvillo testified that he also filed a report complaining that, when he spoke Spanish to fellow crew members, Waldrep said "do not talk that fucking language"; and that, while in the presence of other Hispanic workers, Waldrep told Calvillo to "go back to Mexico, we don't want niggers like you."[46]  Calvillo asserts that he filed this report prior to his termination, but he has not specified the exact date on which he allegedly did so.

Calvillo filed a charge of discrimination on the basis of his national origin with the Equal Employment Opportunity Commission, which subsequently issued a notice of his right-to-sue.  This action followed.

### III.  DISCUSSION

The plaintiff is an immigrant from the United Mexican States (*Estados Unidos Mexicanos*), a federal constitutional republic in North America comprising thirty-one states and a federal district, and commonly known as "Mexico."  Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any

---

[44] *See* doc. no. 19, Exhibit 1 (Deposition of Calvillo), 139-40.

[45] *Id*. at 140.

[46] *See* doc. no. 19, Exhibit 1 (Deposition of Calvillo), 139-40.

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or *national origin*." 42 U.S.C. § 2000e–2(a)(1) (emphasis supplied). The term "national origin" as it is used in Title VII "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Manufacturing Co*., *Inc*., 414 U.S. 86, 88 (1973).[47]  Thus, plaintiff's claims that defendant discriminated against him because of his national origin clearly are cognizable under Title VII.  *See*, *e.g*., *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275-76 (11th Cir. 2002) (recognizing Title VII hostile work environment claim based on plaintiff's Mexican national origin); *Rogers v. Equal Employment Opportunity Comm'n*., 454 F.2d 234 (5th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972) (recognizing that Title VII prohibited termination of employment and hostile

---

[47] The holding of *Espinoza* was that an employer's refusal to hire a person because he is not a citizen of the United States does not constitute discrimination on the basis of "national origin" in violation of Title VII.

> The question posed in the present case . . . is not whether aliens are protected from illegal discrimination under the Act, but what kinds of discrimination the Act makes illegal.  Certainly it would be unlawful for an employer to discriminate against aliens because of race, color, religion, sex, or national origin — for example, by hiring aliens of Anglo-Saxon background but refusing to hire those of Mexican or Spanish ancestry.  Aliens are protected from illegal discrimination under the Act, but nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage.

*Espinoza*, 414 U.S. at 95.

work environments based upon the plaintiff's Mexican national origin).[48]

On the other hand, plaintiff's invocation of 42 U.S.C. § 1981 as an additional basis for claims of discrimination based upon his "national origin" is, at best, problematic.  Although the language of that statute does not include the word "race,"[49] the Supreme Court has construed it as forbidding all "racial" discrimination

---

[48] The *Rogers* action was instituted by the E.E.O.C. on behalf of a Mexican-American female, Mrs. Josephine Chavez, who formerly had been employed in an Optometry clinic owned by S.J. and N. Jay Rogers, doing business as "Texas State Optical."  Mrs. Chavez alleged that she had been fired because of her national origin, and because she complained about her employer's practice of segregating Hispanic patients from "Anglo-Saxon" patients.  *Rogers v. E.E.O.C.*, 454 F.2d at 236. Interestingly, as Justice Thomas observed in his dissenting opinion in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), the former Fifth Circuit's disposition of the *Rogers* was a seminal decision in the sense of recognizing that Title VII permitted actions for harassment on the basis of national origin, race, and gender.

> Years before sexual harassment was recognized as "discriminat[ion] . . . because of . . . sex," 42 U.S.C. § 2000e-2(a)(1), the Courts of Appeals considered whether, and when, a racially hostile work environment could violate Title VII.  In the landmark case *Rogers v. EEOC*, 454 F.2d 234 (1971), *cert. denied*, 406 U.S. 957 (1972), the Court of Appeals for the [former] Fifth Circuit held that the practice of racially segregating patients in a doctor's office could amount to discrimination in "'the terms, conditions, or privileges'" of employment, thereby violating Title VII.  *Id.*, at 238 (quoting 42 U.S.C. § 2000e-2(a)(1)).  . . .

*Id*. at 767-68 (Thomas, J., dissenting).

[49] The pertinent statutory language reads as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (2008).

in the making of private and public contracts.  *See*, *e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 168, 174-75 (1976).

The legislative history of § 1981 — which began with the enactment of the Civil Rights Act of 1866 to implement the (then) recently-ratified Thirteenth Amendment ending the institution of slavery — *is* interesting;  *but*, it also is convoluted, and this is not the case in which to conduct a deep archeological dig into that murky past.[50]  Instead, this court will simply note that in 1987, in the case of *Saint Francis College v. Al-Khazaraji*, 481 U.S. 604 (1987), the Supreme Court redefined the word "race" to include ethnic minorities, for the purpose of extending the protections of § 1981 to private acts of discrimination against ethnic groups.

The plaintiff in *Al-Khazaraji* was a United States citizen who had been born in Iraq.  He brought suit against a private college that had denied him tenure, alleging

---

[50] Readers interested in digging into the history of § 1981 will find the following law review articles to be good springboards into the relevant statutes, its case-law gloss, and interpretative commentary:   Angela M. Ford, *Private Alienage Discrimination and the Reconstruction Amendments:  The Constitutionality of 42 U.S.C. § 1981*, 49 U. Kan. L. Rev. 457 (2001); Rachel R. Munafo, *National Origin Discrimination Revisited*, 34 Cath. Law. 271 (1991); Barbara L. Kramer, Runyon *Reconsidered:  The Future of Section 1981 as a Basis for Employment Discrimination Claims*, 38 Clev. St. L. Rev. 251 (1990); Jennifer Grace Redmond, *Redefining Race in* Saint Francis College v. Al-Khazraji and Sharre Tefila Congregation v. Cobb:  *Using Dictionaries Instead of the Thirteenth Amendment*, 42 Vand. L. Rev. 209 (1989); Donald R. Livingston, *The Court at the Cross Roads*: Runyon, *Section 1981 and the Meaning of Precedent*, 37 Emory L.J. 949 (1988).  *See also*, *e.g.*, *Ortiz v. Bank of America*, 547 F. Supp. 550 (E.D. Cal. 1982); *Espinoza v. Hillwood Square Mutual Association*, 522 F. Supp. 559 (E.D. Va. 1981); *De Malherbe v. International Union of Elevator Constructors*, 438 F. Supp. 1121 (N.D. Cal. 1977); *Jones v. United Gas Improvement Corp.* 68 F.R.D. 1 (E.D. Pa. 1975).  *See generally* 43 A.L.R. Fed. 103, *Applicability of 42 U.S.C.A. § 1981 to National Origin Employment Discrimination Cases* (1979).

that the college had intentionally discriminated against him because he was "an Arabian born in Iraq," in violation of 42 U.S.C. § 1981.  The district court entered summary judgment in favor of the college, finding that § 1981 did not reach discrimination claims based upon a person's national origin ("Arabian ancestry") or religion.  *See Al-Khazraji v. Saint Francis College*, 523 F. Supp. 386 (W.D. Pa. 1986).  The Third Circuit reversed, holding that § 1981 encompasses claims of racial discrimination made by some ethnic groups.  *See Al-Khazraji v. Saint Francis College*, 784 F.2d 505 (3rd Cir. 1986).  Noting that the Supreme Court had ruled in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 287-96 (1976), that individuals who are not black, but who have been victims of racial discrimination, can sue under § 1981, the Third Circuit held that the statute was not limited to the protection of nonwhite persons against racial discrimination: "The protection against racial discrimination thus extends beyond those who are taxonomically members of the Negro race."  *Id*. at 515; *see also id*. at 515 n.12 ("The Supreme Court, *while it has often stated that Section 1981 exists to remedy racial discrimination*, has never precisely defined its conception of 'race.'") (emphasis supplied, citations omitted).[51]

---

[51] The Third Circuit's review of the legislative history of § 1981 convinced the Court that:

> Congress did not intend to limit Section 1981 solely to those who could demonstrate that they had been discriminated against because they belonged to a particular group identified and described by anthropologists.  When Congress referred in the statute to "race," it plainly did not intend thereby to refer courts to any particular scientific

The Supreme Court granted certiorari to address, among other things, the question of "whether a person of *Arabian ancestry* was protected from *racial* discrimination under § 1981," *Al-Khazaraji*, 481 U.S. at 608 (emphasis supplied), and ultimately held that:

> Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination *solely because of their ancestry or ethnic characteristics*. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory. The Court of Appeals was thus quite right in holding that § 1981, "at a minimum," reaches discrimination against an individual "because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of *homo sapiens*." It is clear from our holding, however, that a distinctive physiognomy is not essential to qualify for § 1981 protection. If respondent on remand can prove that he was subjected to intentional discrimination *based on the fact that he was born an Arab*, *rather than solely on the place or nation of his origin*, *or his religion*, he will have made out a case under § 1981.

*Id*. at 613 (emphasis added, footnote omitted). *See also Shaare Tefilia Congregation v. Cobb*, 481 U.S. 615 (1987) (holding that the protections of 42 U.S.C. § 1982 are available under the same test for § 1981 announced in *Al-Khazaraji*).

Thus, if the plaintiff in the present case "can prove that he was subjected to

---

conception of the term. In fact, there is no precise definition of the word.

    We believe that Congress's purpose was to ensure that all persons be treated equally, without regard to color or race, which we understand to embrace, at the least, membership in a group that is ethnically and physiognomically distinctive.

*Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 516-17 (3rd Cir. 1986) (footnotes omitted).

intentional discrimination based on the fact that he was born [Hispanic], rather than solely on the place or nation of his origin [Mexico]," then he arguably can state a cognizable claim under § 1981.  *Al-Khazaraji*, 481 U.S. at 613 (alterations added).

In any event, the elements of proof for a § 1981 claim are essentially the same as for a Title VII claim.  *See*, *e.g.*, *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (describing § 1981 as "a parallel remedy against discrimination which . . . derive[s] its legal principles from Title VII") (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)).[52]  In other words, because "[b]oth of these statutes have the same requirements of proof and use the same analytical framework, . . . we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also*, *e.g.*, *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("When section 1981 is used as a parallel basis for relief with Title VII against disparate treatment in employment, its elements appear to be identical to those of section 706 [of Title VII, *i.e.*, 42 U.S.C. § 2000e-5].") (citations omitted).  Indeed, the Eleventh Circuit has long recognized that when "a plaintiff predicates liability under Title VII on disparate treatment and

---

[52]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

also claims liability under sections 1981 and 1983, the legal elements of the claims are identical." *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985). *See also*, *e.g.*, *Brown v. American Honda Motor Co.*, *Inc.*, 939 F.2d 946, 949 (11th Cir. 1991) ("Section 1981 requires proof of *intentional* discrimination. . . . The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases.") (citations omitted) (emphasis in original); *Palmer v. District Board of Trustees of St. Petersburg Junior College*, 748 F.2d 595, 596 n.2 (11th Cir. 1984) (same). Accordingly, this court will "explicitly address the [plaintiff's] Title VII claim[s] with the understanding that the analysis applies to the § 1981[s] claim as well." *Standard v. A.B.E.L. Services*, *Inc.*, 161 F.3d at 1330.

Of course, proving that an employer relied upon the plaintiff's ethnicity (Hispanic) or national origin in its treatment or termination of the employee — *i.e.*, "proving that intentional discrimination motivated the employer," *Wilson v. B/E Aerospace*, *Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) — is rarely a straightforward undertaking.

> Frequently, acts of discrimination may be hidden or subtle; an employer who intentionally discriminates is unlikely to leave a written record of his illegal motive, and may not tell anyone about it. . . . Because of these realities, plaintiffs are often obliged to build their cases entirely around circumstantial evidence. The unique proof problems that

accompany discrimination cases are the genesis of the unique solutions that the Supreme Court has devised for those cases in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973),] and its progeny.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997).

Thus, where there is no direct evidence of discrimination, the plaintiff bears the initial burden of establishing a *prima facie* case of an employer's intent to discriminate on the basis of race. *E.g.*, *Vessels v. Atlanta Independent School System*, 408 F.3d 763 767 (11th Cir. 2005) (citing *McDonnell Douglas*, 411 U.S. at 802). "Establishment of the *prima facie* case in effect creates a *presumption* that the employer unlawfully discriminated against the employee." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1973) (emphasis supplied).

"The effect of the presumption of discrimination created by establishment of the *prima facie* case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs*, 106 F.3d at 1528 (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254). The employer's burden at the second stage of analysis "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)). "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered

reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55 (citation and footnote omitted)).  Indeed, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257.

If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *id.*, then the "rebuttable presumption" of discrimination created by the demonstration of a *prima facie* case[53] is refuted, "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.

In this final step of the analytical process, the burden shifts back to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely a pretext for intentional discrimination.

---

[53]*See Burdine*, 450 U.S. at 254 n.7 (explaining that, in the *McDonnell Douglas* context, the phrase "*prima facie* case" is used to "denote the establishment of a legally mandatory, rebuttable presumption [of discrimination]").

*Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). *See also Wilson*, 376 F.3d at 1088 ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient.") (internal citation omitted). The plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (internal quotations and citation omitted).

If a plaintiff demonstrates pretext, he "is entitled to survive summary judgment," *id.* at 1529, *except* in the rare case where, notwithstanding the evidence of pretext, "no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 134-35. *See also Brooks v. Jefferson County Commission*, 446 F.3d 1160, 1163 (11th Cir. 2006). In any case, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

## A.     Plaintiff's Hostile Work Environment Claim

Calvillo alleges that Tyson gave Caucasian employees "more favorable terms

and conditions of employment than he and others of foreign national origin."[54]  As support for his claim, Calvillo alleges that the totality of the following incidents created a hostile work environment:  (1) Waldrep often called Calvillo and other Hispanics "wetbacks";[55] (2) Waldrep stated that the drinking water provided to Calvillo's crew (which Calvillo believed to be contaminated) was "good enough for wetbacks like you," and "[t]hat water is good enough for a Hispanic *black* like you";[56] (3) Waldrep said that his brother was a member of the K.K.K., and "many times" told Calvillo that he would get his brother to burn Calvillo's home;[57] (4) "many times" Waldrep told Calvillo not to talk "that fucking language" (Spanish) when speaking to other crew members;[58] (5) on April 5, 2006, and "everyday," Waldrep told Calvillo to "go back to Mexico, we don't want *niggers* like you";[59] and (6) on April 5, 2006, Waldrep told Calvillo, "because you support [Mexicans], you should just go back. You're taking our work away from us."[60]

A *prima facie* case for a claim of hostile work environment requires proof of

---

[54] Doc. no. 1 (Complaint), ¶ 20.

[55] Doc. no. 19, Exhibit 1 (Deposition of Calvillo), at 133

[56] *Id*. at 131-32, 135-37 (emphasis supplied).

[57] *Id*. at 138

[58] *Id*. at 141-42.

[59] *Id*. at 142-43 (emphasis supplied).

[60] *Id*. at 147.

five elements:

> (1) that [plaintiff] belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (recognizing Title VII hostile work environment claim based on plaintiff's Mexican national origin).

Tyson does not dispute that Calvillo belongs to a protected group, that he was subject to unwelcome harassment, that the harassment was based upon Calvillo's national origin, or that Calvillo *testified* that he reported the harassment to Tyson's personnel office prior to his termination. The lone argument advanced by Tyson in favor of summary judgment is that Calvillo's hostile work environment claim fails as a matter of law because he has not established the fourth element — *i.e.*, that the harassment was sufficiently server or pervasive as to alter the terms and conditions of Calvillo's employment.

The fourth element of a *prima facie* case contains both an objective and subjective component. *See, e.g., Johnson v. Booker T. Washington Broadcasting*

*Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) ("Harassment is severe or pervasive for Title VII purposes *only if* it is *both* subjectively *and* objectively severe [or] pervasive.") (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*)) (emphasis supplied).  To be actionable, a plaintiff must show not just that he or she subjectively believed the environment to be hostile or abusive, but that a *reasonable person* in the same or a similar position also would perceive it as such. *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).   When evaluating the objective severity of the harassment, district courts must examine all of the circumstances, which may include (but is not limited to) such factors as:  the frequency of the discriminatory conduct; its severity;  whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and, whether the conduct unreasonably interfered with the plaintiff's work performance.  *Id.* at 23; *see also, e.g., Miller*, 277 F.2d at 1276; *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997).  District courts are instructed to "consider the alleged conduct in context and cumulatively," and to "look at the totality of the circumstances" when determining whether the alleged conduct was objectively severe. *Mendoza*, 195 F.3d at 1242.

Calvillo has clearly established that he perceived Waldrep's behavior as harassment.  He testified that he filed a complaint with Tyson's personnel office six

or seven months before his termination in order to report Waldrep's mistreatment of
him.[61]  Calvillo further testified that Waldrep's use of the term "wetback" would
"infuriate" him, and that when Waldrep used the term as a synonym for persons who
were born in Mexico (or Hispanics), he would correct Waldrep by stating "we're not
wet."[62]  Calvillo also testified that he "would never call one of [his] Countrymen a
wetback," and that he did not laugh when he heard the term because it was offensive
to him and his "race."[63]

Calvillo has also established that a reasonable person could find the totality of
Waldrep's alleged conduct to be both severe and pervasive, even though he is not
required to prove both.  First, as to the "pervasiveness" prong, the conduct
complained of by Calvillo was not infrequent.  Calvillo has identified six separate
derogatory statements by Waldrep, and he testified that, over the eighteen months that
Waldrep served as his supervisor, Waldrep made several of these statements
"everyday" and "many times."  *See*, *e.g.*, *Johnson*, 234 F.3d 501 ("roughly fifteen
separate instances of harassment over the course of four months" was sufficiently
frequent); *Miller*, 277 F.3d 1269 (a Mexican-American plaintiff's exposure to verbal
ethnic slurs such as "wetback" by another employee "three to four times a day," over

---

[61] Doc. no. 19, Exhibit 1 (Deposition of Calvillo), at 139-40.

[62] *Id*. at 133-34.

[63] *Id*. at 134-35.

approximately one month was frequent).  Waldrep's behavior also was severe, as it included implicit threats to burn Calvillo's home, suggestions to "go back to Mexico," comments that drinking water Calvillo believed to be contaminated was "good enough for wetbacks like you," and use of ethnic slurs that included racist terminology (*e.g.*, "a *black* Hispanic like you," "*niggers* like you").  The threats of arson, and the fact that derogatory statements were made in front of other members of the crew, also establishes that Waldrep's behavior was both physically threatening and humiliating.  Even though Calvillo has not produced evidence that Waldrep's behavior interfered with his job performance, "[t]he Supreme Court has cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable."  *Miller*, 277 F.3d at 1277 (citing *Harris*, 510 U.S. at 22).

When considering all of the evidence in the light most favorable to Calvillo, the court finds that he has clearly and unequivocally established a *prima facie* hostile work environment claim.  Further, Tyson cannot offer a non-discriminatory justification for the conduct of its supervisor.  Consequently, summary judgment is due to be denied, and Calvillo is entitled to present this claim to a jury.

**B.    Plaintiff's Termination Claim**

Calvillo alleges that Tyson terminated him "for reasons which non-protected

-24-

employees are not terminated."[64]   Calvillo contends that he has provided direct evidence of discrimination with respect to his termination by identifying two alleged statements by his supervisor, Wayne Waldrep.  First, Calvillo points to his testimony that Waldrep instructed him to hang curtains on July 31, 2006, by first stating: "Hey, fucking wetback, come here you."[65]   Calvillo argues that this statement is direct evidence that his termination was discriminatory, because he was later fired due to his refusal to follow Waldrep's instructions.  Second, Calvillo points to the affidavit of Karen Lee Boyd, who stated that when Calvillo walked onto her farm on August 1, 2006, in an effort to rejoin his crew, Waldrep said:  "Get that fucking spick off my farm. . . . He doesn't work for Tyson anymore."[66]

The term "direct evidence" is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption.  *See*, *e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095,

---

[64] Doc. no. 1 (Complaint), ¶ 23.

[65] *See* doc. no. 21, Exhibit 3 (video clip of Calvillo's deposition).  This statement is omitted from the transcript of the deposition of Calvillo due to a typographical error by the court reporter. Calvillo attached a video of his deposition to his responsive brief to Tyson's motion for summary judgment, which shows that Calvillo testified that Waldrep said "Hey, fucking wetback, come here you," before instructing him to hang the curtains.  Tyson, in its reply brief, argues that Calvillo cannot rely on this testimony to defeat summary judgment because Calvillo did not follow the procedural requirements of Federal Rule of Civil Procedure 30(e) to modify the deposition transcript. However, Calvillo's failure to modify the transcript of the deposition pursuant to Rule 30(e) does not prevent the court from considering the video of Calvillo's deposition, and Calvillo would be subject to undue prejudice if his testimony was not considered.

[66] Doc. no. 21, Exhibit 2 (Affidavit of Karen Lee Boyd).

1111 (11th Cir. 2001) (holding that the term "direct evidence," when used in the context of Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption"); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (same); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir. 1982) ("Where the evidence for a *prima facie* case consists . . . of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the *prima facie* evidence the ultimate issue of discrimination is proved; no inference is required.").  *See generally Black's Law Dictionary* 577 (7th ed. 1999) (defining "direct evidence" as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

-26-

Due to the "powerful" nature of direct evidence, the Eleventh Circuit "has marked severe limits for the kind of language [that may] be treated as direct evidence of discrimination." *Id.* (citing *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 962 (11th Cir. 1997).  To be deemed as such, "a statement must:  (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).  Here the statements that Calvillo asserts constitute direct evidence of discrimination *were* made by a decisionmaker (Waldrep), and each unquestionably is evidence of a blatant discriminatory attitude; however, they did not specifically relate to plaintiff's termination.  Although the statements by Waldrep were made on the days surrounding Calvillo's termination, the statements require a factfinder to infer or presume that Waldrep recommended Calvillo's termination *because of* his national origin, as opposed to his job performance or insubordinate conduct.  The Eleventh Circuit said in *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354 (11th Cir. 1999), that a clear example of direct evidence of an employer's intent to discriminate on the basis of an employee's protected characteristic that specifically related to the employee's termination "would be a management memorandum saying, 'Fire Earley — he is too

old.'" *Id*. at 1359 (quoting *Earley*, 907 F.2d at 1082).[67]  Simply, when Waldrep's alleged statements are considered alongside the circumstances of Calvillo's termination, they do not directly evidence that he recommended Calvillo's termination *because of* his national origin, as opposed to Calvillo's insubordination when refusing to follow Waldrep's directive to hang curtains.

That does not mean that Waldrep's statements can or should be disregarded, just that they are evidence of discrimination that must be analyzed in the context of the circumstantial framework established in *McDonnell Douglas*.  *See E.E.O.C. v. Joe's Stone Crab*, 220 F.3d 1263, 1286 (11th Cir. 2000) ("Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar *McDonnell Douglas* paradigm for circumstantial evidence claims.").  Accordingly, Calvillo bears the initial burden of establishing a *prima facie* case of Tyson's intent to terminate his

---

[67] *See also Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir. 1987), where the Court observed that:

> One example of direct evidence would be a scrap of paper saying, "Fire Rollins —— she is too old." *See Williams* [*v. General Motors Corp.*], 656 F.2d [120,] at 130 [(5th Cir. 1981)].  This court found that there was direct evidence of discrimination when an INS reviewing committee set aside a female applicant's file without reviewing it because the two men knew the director would not consider hiring a woman investigator. *Lewis v. Smith*, 731 F.2d 1535 (11th Cir. 1984).  In these instances, the fact that the evidence exists, by itself, proves the discrimination.  The evidence at issue here, on the other hand, suggests discrimination.  The trier of fact must infer discrimination based on the evidence.  By definition, then, it is circumstantial evidence.

*Id*. at 1528 n.6.

employment because of his national origin.

A *prima facie* case of a claim of discriminatory termination requires proof of the following four elements:  (1) Calvillo was born in Mexico; (2) he was qualified to perform the duties of the position he occupied on the date of his termination; (3) he was fired; and (4) "he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." *Maynard v. Board of Regents of the Divisions of Universities of Florida Dep't of Education*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas,* 411 U.S. at 802).

It is undisputed that Calvillo has established the first three elements of the *prima facie* case:  he was a member of a protected group; he was qualified to work as a harvester operator; and his employment with Tyson was terminated.  Tyson focuses on the fourth element, and argues that Calvillo cannot establish a *prima facie* case because he was replaced by a person within his protected group, Roberto Barajas Ramirez, and, he cannot show that Tyson treated similarly-situated individuals outside his protected class more favorably than him.  Specifically, Tyson asserts that Calvillo has not presented any evidence indicating that another non-Hispanic employee who was accused of the *same* behavior as plaintiff was not terminated. Calvillo counters this argument by noting that Anthony Lemaster, a Caucasian crew

member, also refused to hang curtains on July 31, 2006, but he was not disciplined for his insubordinate conduct.

To determine whether other employees are "'similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Maynard*, 342 F.3d at 1289 (quoting *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998)). "The comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citation omitted); *see also Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples.").

Tyson argues that Lemaster was not similarly situated because Calvillo used profanity when refusing Waldrep's directive to hang curtains, stating "it's not my fucking job."  Tyson also contends that Calvillo made an obscene gesture ("flipped the bird") to Waldrep.  When viewing the record in a light most favorable to Calvillo, however, the court cannot find that Calvillo made this gesture while refusing to hang

the curtains on July 31, 2006.

Moreover, Calvillo's use of profanity in responding to Waldrep is not sufficient to prevent Lemaster from being a valid comparator, because the alleged profanity was irrelevant to Tyson's stated reason for terminating Calvillo's employment. Tyson's Human Resources Manager, Allan Trotter, stated in his declaration that "Calvillo was terminated as a result of his insubordinate conduct."[68] Trotter further stated that Calvillo's termination was pursuant to "Tyson's Rules of Conduct," which provide that an employee may be terminated for "insubordination or refusal to perform a work assignment."[69] Simply, Calvillo has shown that he was terminated for refusing his supervisor's instruction to hang the curtains, while Tyson has not produced any evidence that Lemaster was subject to *any* discipline for his alleged refusal to complete the same task on the same day. Calvillo has satisfied his burden of showing that Tyson treated a non-Hispanic, similarly-situated individual more favorably. Thus, Calvillo has satisfied the *prima facie* requirements for his claim of national origin discrimination in termination.

Because Calvillo has made out a *prima facie* case, the burden shifts to Tyson "to articulate a legitimate, nondiscriminatory reason for the discharge." *Tipton v.*

---

[68] *See* doc. no. 19, Exhibit 3 (Declaration of Allan Trotter), ¶ 3.
[69] *Id*.

*Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494-95 (11th Cir. 1989).

Tyson has produced evidence that it terminated Calvillo for insubordination, and that

Calvillo understood that he could be terminated for refusing to obey Waldrep's

instruction.[70]   In response, Calvillo argues that Tyson's proffered reason for his

termination is merely pretext for national origin discrimination. *See Tipton*, 872 F.2d

at 1495 ("If the employer articulates some legitimate, nondiscriminatory reason for

the discharge, then the employee must be given the opportunity to demonstrate that

the employer's reason is pretextual").  Calvillo recounts that Lemaster was not subject

to any discipline for his alleged insubordinate conduct, and notes that Waldrep

allegedly used profanity and derogatory terms when instructing him to hang the

curtains ("Hey, fucking wetback, come here you"), but did not use such language

when instructing Lemaster to hang the curtains.

   The court finds that Calvillo has satisfied his burden of "cast[ing] sufficient

doubt on [Tyson's] proffered nondiscriminatory reasons to permit a reasonable

factfinder to conclude that the employer's proffered 'legitimate reasons were not what

actually motivated its conduct' . . . ." *Combs*, 106 F.3d at 1538 (quoting *Cooper-*

*Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  The contrast

between Waldrep's statements and actions toward Calvillo and Lemaster demonstrate

---

[70] *See* doc. no. 19, Exhibit 2 (Declaration of Angela Cole), ¶ 13.

that a reasonable factfinder could find that it is implausible and inconsistent to believe that Waldrep's motivations for recommending Calvillo's termination were not due to his national origin. *Id.* Thus, Calvillo is entitled to survive summary judgment on his claim of discriminatory termination.

## C.   Plaintiff's Job Assignments Claim[71]

Calvillo also alleges that Tyson "discriminates against its employees by national origin in job classification," because "[m]ore desirable jobs are awarded to white employees."[72]   Specifically, Calvillo asserts that "[h]is job was to catch chickens with a machine," and that "he was assigned to a more difficult, menial job that a white employee refused to do."[73]

A *prima facie* case of a claim of discriminatory job assignments requires proof of four elements:  (1) he is a member of a protected class; (2) "he was subjected to [an] adverse employment action; (3) [Tyson] treated similarly situated non-minority employees outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Tyson does not protest Calvillo's establishment of the first and fourth elements — that he is a

---

[71] As observed in footnote 4 *supra*, "Plaintiff concedes that summary judgment should be granted regarding Plaintiff's class action and wage [discrimination] claims."  Doc. no. 21, at 2.

[72] Doc. no. 1 (Complaint), ¶ 14.

[73] *Id.*, ¶ 13.

member of a protected class, and that he was qualified to perform the duties of his job.  The leading argument advanced by Tyson in favor of summary judgment is that Calvillo has failed to establish the second element of the *prima facie* case — *i.e.*, that he has suffered an adverse employment action with regard to his job assignments.

Calvillo testified that the "menial jobs" to which he refers included hanging curtains in chicken houses and operating the controls on the machine, whereas "whites only did the [job of] walking besides the machines."[74]  However, Calvillo also testified that he believed he was often assigned to operate the controls of the machine because he was "the best one at the job [of operating the controls]," and that other employees of American and Mexican origin were assigned other jobs because they were not good at operating the controls.[75]

A fundamental principle of employment discrimination law is that Title VII is not a "general civility code"; in other words, it does not protect employees from "the ordinary tribulations of the workplace."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).[76]  It follows, therefore, that an employment action does not become

---

[74] *See* doc. no. 19, Exhibit 1 (Deposition of Calvillo), at 124-25.

[75] *Id*. at 114-15.

[76]*See also, e.g.*, *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (holding, in the context of a case founded on the Americans with Disabilities Act ("ADA"), that "the ADA, like Title VII, is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'") (citing *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998)).

actionably *adverse* "merely because the employee dislikes it or disagrees with it." *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting *Perryman v. West*, 949 F. Supp. 815, 819 (M.D. Ala. 1996)).  *Accord McCoy v. Macon Water Authority*, 966 F. Supp. 1209, 1220 (M.D. Ga. 1997).

Stated somewhat differently, a plaintiff's subjective feelings and personal reactions are not the complete measure of whether a contested employment action is sufficiently "adverse" to be actionable under federal employment discrimination statutes.  If a plaintiff's individualized response to an employer's decision was the test for determining "adversity," then "the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee. . . ."  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).[77]

Ultimately, therefore, a plaintiff within the Eleventh Circuit must show a *serious and material* change in the terms, conditions, or privileges of his employment, and the plaintiff's subjective view of the significance of his employer's action is not controlling; rather, it must be demonstrated that a reasonable person, placed in the plaintiff's same position, would have viewed the contested employment

---

[77] Indeed, the Eleventh Circuit panel deciding *Doe v. Dekalb County School District* "found no case, in this or any other circuit, in which a court explicitly relied on the subjective preferences of a plaintiff to hold that that plaintiff had suffered an adverse employment action." *Doe*, 145 F.3d at 1448 (footnote omitted); *see also id.* at 1449 (reiterating that "no panel of this circuit has ever listed a plaintiff's particular subjective preference as a basis for its holding that a transfer was adverse") (footnote omitted).

action as materially adverse under the circumstances, before it may be said to rise to the level of an actionable, "adverse" employment action. *See, e.g.*, *Davis v. Town of Lake Park*, 245 F.3d at 1239. "Any adversity must be material; it is not enough that a transfer[, or any other contested employment action,] imposes some *de minimis* inconvenience or alteration of [the terms, conditions, privileges, or] responsibilities [of the plaintiff's job position]." *Doe*, 145 F.3d at 1453 (citing *Crady v. Liberty National Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)) (footnote omitted);[78] *see also Davis*, 245 F.3d at 1239 ("Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job *in a real and*

---

[78] In the omitted footnote, the *Doe* Court observed that:

> It is important not to make a federal case out of a transfer that is *de minimis*, causing no objective harm and reflecting a mere chip-on-the-shoulder complaint. However, it is equally important that the threshold for what constitutes an adverse employment action not be elevated artificially, because an employer's action, to the extent that it is deemed not to rise to the level of an adverse employment action, is removed completely from any scrutiny for discrimination. In other words, where the cause or motivation for the employer's action was clearly its employee's disability, a finding that the action does not rise to the level of an adverse employment action means that the action is not scrutinized for discrimination. An artificially high threshold for what constitutes an adverse employment action would undermine the purposes of the statute by permitting discriminatory actions to escape scrutiny. We believe that the purposes of the statute are appropriately served by requiring the fact finder to determine whether a reasonable person would consider the action adverse under all the facts and circumstances.

*Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1453 n. 21 (11th Cir. 1998).

*demonstrable way.*") (emphasis supplied).

Calvillo has failed to produce evidence indicating that the assignments of hanging curtains or operating the controls of the so-called "chicken catching machine" constituted employment actions that are sufficiently "adverse" as to be cognizable in this court. These assignments were part of the duties of a harvester operator, and Calvillo has not established that his assignment to some (but not all) of the tasks was a serious and material change in the terms, conditions, or privileges of his employment.[79] Moreover, Calvillo has failed to present evidence indicating that Tyson assigned him duties because of his national origin. Calvillo testified that Waldrep assigned non-Mexican crew members the same tasks to which he was assigned, and that he was assigned certain tasks because of his ability.[80] Lastly, Calvillo fails to elaborate on his argument in response to Tyson's motion on this claim, and lists two arguments in bullet-point fashion. Even making all reasonable inferences in favor of Calvillo, his vague arguments cannot reasonably be construed to establish that his daily job assignments rose to the level of legally-cognizable adverse employment actions. Consequently, Calvillo cannot make out a *prima facie*

---

[79] *See* doc. no. 19, Exhibit 4 (Declaration of Wayne Waldrep), ¶¶ 5-6. *See also* doc. no. 19, Exhibit 1 (Deposition of Calvillo), at 184 (Calvillo stating that "the thing was that I would put the curtains up one day, Anthony the next day. So that day I put the first house, Marcos put the second house, and then the third house, it was Anthony's turn.").

[80] *See also* doc. no. 19, Exhibit 1 (Deposition of Calvillo), at 126-31.

case of national origin discrimination in job assignments.

## IV.  CONCLUSION

For the foregoing reasons, Tyson's motion for summary judgment is due to be GRANTED as to Calvillo's claims of national origin discrimination in wages and job assignment.  Summary judgment is due to be DENIED as to Calvillo's claims of national origin discrimination in the termination of his employment, and, hostile work environment.  An appropriate order, consistent with this memorandum opinion, will be entered contemporaneously herewith.

DONE and ORDERED this 26th day of January, 2009.

_____
United States District Judge